FILED

# UNITED STATES DISTRICT COURT

JAN 1 3 2010

## NORTHERN DISTRICT OF MISSISSIPPI

*D. Adams*
Deputy

### INDICTMENT FOR
### ACTS AFFECTING A PERSONAL FINANCIAL INTEREST
### AND FALSE STATEMENTS TO A FEDERAL AGENCY & AGENT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. *3:10 CR003* |
| | : | |
| *versus* | : | 18 U.S.C. § 208(a) |
| | : | 18 U.S.C. § 216(a)(1) |
| PHILIP HALBERT NEILSON | : | 18 U.S.C. § 1001(a)(3) |
| | : | 18 U.S.C. § 1001(a)(2) |
| | : | 18 U.S.C. § 2 |

## THE GRAND JURY CHARGES:

## AT ALL TIMES RELEVANT TO THIS INDICTMENT:

## THE DEFENDANT

1.      The defendant herein, **PHILIP HALBERT NEILSON (NEILSON)**, was an

employee of the executive branch of the United States Government.  **NEILSON** was a Special

Agent of the Federal Bureau of Investigation (FBI) and assigned to the Jackson, Mississippi

Division.  From in or about 1998 through mid-2008, **NEILSON** was the Supervisory Senior

Resident Agent in charge of the Oxford Resident Agency.

## CONSTRUCTION AND LEASE OF THE OXFORD FBI BUILDING

2.      Beginning in or about 2001, the FBI's Oxford Resident Agency, along with the

General Services Administration (GSA), began the process of selecting a new location to house

the FBI in Oxford, Mississippi.  **NEILSON** was actively involved on behalf of the FBI during

the site selection process.

3.     In or about September 2002, GSA awarded a lease to C&G Partnership to house the FBI Oxford Resident Agency. At that time, and continuing to in or about 2004, C&G Partnership consisted of JC and DG.

4.     Upon being awarded the lease, C&G Partnership constructed a building at 2109 University Avenue, Oxford, Mississippi (Oxford FBI Building) to house the FBI's Oxford Resident Agency. The building was owned and managed by C&G Partnership. An appraisal dated September 9, 2005, valued the Oxford FBI Building at $3,165,000.

5.     Beginning in or about June 2004, the FBI's Oxford Resident Agency leased and thereafter occupied space within the Oxford FBI Building. The Oxford FBI Building was also occupied by other federal law enforcement agencies and had additional space available for lease.

**NEILSON'S FINANCIAL INTEREST IN THE OXFORD FBI BUILDING**

6.     At some time in 2004, **NEILSON** joined C&G Partnership. **NEILSON**, JC and DG each held a one third interest in C&G Partnership. **NEILSON** did not contribute any money for his interest in C&G Partnership and his ownership in the Oxford FBI Building. **NEILSON**, JC, and DG were also partners in ACM Properties, LLC (ACM), another entity which owned various properties. Various bank accounts of C&G Partnership were opened, maintained, and controlled by JC. Also, JC controlled the bank account of ACM.

7.     In May 2005, **NEILSON** and his partners decided to disburse $150,000 from C&G Partnership. **NEILSON** and his partners agreed that each would receive $50,000 as a loan which had to be repaid. The sole source of these funds was deposits made by the United States Treasury on behalf of GSA. Such deposits were monthly payments for the leasing of the Oxford

2

FBI Building, as well as reimbursements for overages associated with the construction of the Oxford FBI Building.

8.      In or about May, 2005, each partner received $50,000.  JC issued $50,000 checks to himself and DG from a C&G Partnership account.

9.      The $50,000 received by **NEILSON** was transferred from a C&G Partnership Account to an account in the name of ACM.  On or about May 20, 2005, an ACM check in the amount of $50,000 was issued by JC and made payable to **NEILSON**.  Although the check was a result of the C&G partners' decision to loan funds of C&G Partnership to **NEILSON**, the memo line on the ACM check stated "sale."  Neither the check issued to JC nor the check issued to DG referred to a "sale" or were routed through the account of ACM.

10.      On or about May 23, 2005, **NEILSON** endorsed the $50,000 ACM "sale" check, deposited it into his personal bank account, and immediately thereafter used a substantial portion of the funds to pay personal credit card debts and other expenses.

11.      C&G Partnership continued until October 2005 when its assets, including the Oxford FBI Building, were transferred to a new entity titled C&G Properties, LLC.  On or about October 7, 2005, **NEILSON** signed a Limited Liability Company Agreement wherein he identified himself as a one-third "member" of C&G Properties, LLC.  Also on or about October 7, 2005, **NEILSON** signed a Management and Leasing Agreement, wherein he acknowledged that he was a member and manager of C&G Properties, LLC.

12.      As a member and manager, **NEILSON** was jointly responsible for, among other things, managing the Oxford FBI Building, including advertising for, finding, and negotiating

3

with prospective tenants for the benefit of C&G Properties, LLC. **NEILSON** was also jointly responsible for performing all services that were necessary and proper for the operation and management of the Oxford FBI Building.

## NEILSON'S PARTICIPATION AS AN FBI AGENT IN MATTERS REGARDING THE OXFORD FBI BUILDING

13.      In or about 2005, as the FBI's Supervisory Senior Resident Agent in Oxford, **NEILSON** participated in certain matters regarding the Oxford FBI Building which he owned, including, but not limited to, the recommendation to the FBI to lease additional space in the Oxford FBI Building and the preparation of "punch lists" regarding the construction of the building.

## NEILSON'S KNOWLEDGE OF FINANCIAL DISCLOSURE REQUIREMENTS

14.      As a Supervisory Senior Resident Agent of the FBI, **NEILSON** was required to file annual reports of his assets, income, liabilities, and all positions which he held outside of his government employment, even positions which were not paid.

15.      The annual reporting form was entitled "Executive Branch Confidential Financial Disclosure Report" (Disclosure Report). The annual Disclosure Report included instructions which explained the terms "assets," "income," "liabilities," and "outside positions."

16.      Instructions for the Disclosure Report were made available to **NEILSON**. The instructions informed **NEILSON** that he was required to provide information about his outside interests and activities sufficient to permit ethics officials to make informed determinations regarding potential conflicts of interest. **NEILSON** was also informed that a knowing and willful falsification of information required to be reported could result in criminal prosecution.

4

If an employee filed a Disclosure Report in the previous year and his reportable information had not changed, it was permissible to incorporate the responses from the previous year and certify that those responses were true, complete and correct for the current year.

17.     **NEILSON** was responsible for preparing and certifying the truthfulness, completeness, and correctness of his annual Disclosure Reports. Also, **NEILSON** was responsible for submitting his annual Disclosure Reports to his supervisors for review of actual or potential conflicts between his public responsibilities as an FBI supervisor and his private interests and activities.

18.     **NEILSON** prepared and submitted to his FBI supervisors annual Disclosure Reports beginning in or about 1999 and continuing through 2008.

19.     On occasion, **NEILSON** asked JC for the balance due on the loan made for the financing of the Oxford FBI Building, stating that he had to disclose such information to the FBI.

## FALSE STATEMENTS REGARDING FBI APPROVAL TO HAVE A PERSONAL FINANCIAL INTEREST IN THE OXFORD FBI BUILDING

20.     Beginning in mid-2005 and continuing through October 2005, **NEILSON** had multiple conversations with JC, DG, and BW, an attorney representing C&G Partnership, regarding **NEILSON'S** ability to own an interest in the Oxford FBI Building.

21.     **NEILSON** falsely assured JC, DG, and BW that he had checked with an FBI attorney and had received approval to own an interest in the Oxford FBI Building.

5

## COUNT ONE

### LEASE OF ADDITIONAL SPACE IN THE OXFORD FBI BUILDING

22.     Paragraphs 1 through 21 are re-alleged and incorporated herein.

23.     In or about February 2005, **NEILSON** recommended that the FBI lease additional space within the Oxford FBI Building for the purpose of acquiring additional storage space and locating a telecommunications workshop for FBI vehicles.  In a particular e-mail to a fellow FBI employee, **NEILSON** stated that the space "would be ideal."

24.     In the same e-mail, **NEILSON** also informed his FBI colleague that a monthly lease payment of $900 was possible and that the price was negotiable with the owners. Although **NEILSON** had a financial interest in C&G Partnership, the entity which owned and managed the Oxford FBI Building, he failed to disclose such fact to the FBI when discussing a possible new FBI lease of space within the Oxford FBI Building and the additional monthly cost for such a new lease.

25.     **NEILSON** solicited and obtained information from an FBI employee which was beneficial to his personal financial interest, in that, on or about February 8, 2005, **NEILSON** obtained information regarding the amount of rent the FBI would be willing to pay for the additional space based on a survey of the amounts paid by other FBI offices for similar space.

26.     On or about June 12, 2005, JC, **NEILSON'S** partner in the Oxford FBI Building, informed a potential lender that the FBI was working to lease additional space within the Oxford FBI Building.  Such an additional lease would reduce the out-of-pocket costs of refinancing the construction loan used to build the Oxford FBI Building.

6

27.     On or about August 1, 2005, **NEILSON** advised an FBI supervisor that additional space in the Oxford FBI Building was available for lease.

28.     On or about August 3, 2005, **NEILSON** was instructed by his FBI supervisor to contact the building owner and inquire about the cost for leasing additional space. **NEILSON** later reported that same day to his supervisor that he had taken steps to contact the building owner, but concealed the fact that he was an owner of the Oxford FBI Building.

29.     On or about August 12, 2005, FBI personnel from Jackson, Mississippi traveled to the Oxford FBI Building to take measurements of the additional storage space in order to determine its suitability.

30.     Sometime in or after August 2005, **NEILSON** expressed frustration to an FBI administrative official that the lease of additional space within the Oxford FBI Building was not approved by FBI Headquarters.

31.     While communications regarding the lease of additional space in the Oxford FBI Building were ongoing, **NEILSON** failed to disclose to the FBI the fact that he had a financial interest in the Oxford FBI Building, and had enjoyed such interest since 2004.

32.     From in or about February 2005 through in or about August 2005, in the Northern District of Mississippi, the defendant, **PHILIP HALBERT NEILSON**, while employed by the FBI, did willfully participate personally and substantially as such FBI employee, through recommendation, the rendering of advice, and otherwise, in a particular

7

matter in which, to his knowledge, he had a financial interest, in that **NEILSON** recommended and advised that the FBI lease additional space in the Oxford FBI Building.

The above is a violation of Title 18, United States Code, Sections 208(a), 216(a)(2) and 2.

**COUNT TWO**

**CONSTRUCTION PUNCH LIST FOR THE OXFORD FBI BUILDING**

33.     Paragraphs 1 through 21 are re-alleged and incorporated herein.

34.     On or about September 3, 2004, **NEILSON** provided a list of items for the "final walkthrough" on the Oxford FBI Building to a representative of the General Services Administration, the government agency responsible for leasing space on behalf of government agencies, including the FBI.

35.     Later in or about September 2004, and again in or about March 2005, **NEILSON** was asked by GSA representatives and fellow FBI employees to identify punch list items to be corrected by the owners of the Oxford FBI Building.

36.     On or about August 2, 2005, **NEILSON** informed FBI administrators and management that he had met with a GSA representative that morning regarding unresolved issues of space and matters remaining on the punch list for the Oxford FBI Building. **NEILSON** directed the GSA representative to contact other FBI administrators for resolution of remaining punch list items.

8

37.     On or about August 3, 2005, **NEILSON'S** FBI supervisor instructed him to review the construction punch list and submit a list to the FBI Administrative Officer of the outstanding items.

38.     On or about August 9, 2005, **NEILSON** reported to FBI officials that some items on the construction punch list had been remedied, with other matters remaining to be resolved.  **NEILSON'S** list of items to be remedied was sent to GSA.

39.     On or about August 12, 2005, an FBI employee reported to his supervisor that he conducted an inspection of the Oxford FBI Building pursuant to the punch list created by **NEILSON.**

40.     On or about August 16, 2005, **NEILSON** informed his supervisor that JC and the contractor for the Oxford FBI Building had agreed to repair certain problems identified on prior construction punch lists.

41.     While communications regarding construction punch list matters were ongoing, **NEILSON** failed to disclose to the FBI the fact that he had a financial interest in the Oxford FBI Building, and had enjoyed such interest since 2004.

42.     Beginning in or about March 2005 and continuing through in or about August 2005, in the Northern District of Mississippi, the defendant, **PHILIP HALBERT NEILSON**, while employed by the FBI, did willfully participate personally and substantially as such FBI employee, through recommendation, the rendering of advice, and otherwise, in a particular matter in which, to his knowledge, he had a financial interest, in that **NEILSON** recommended,

9

advised, and otherwise participated in evaluating, preparing, and resolving a construction punch list regarding the Oxford FBI Building.

The above is a violation of Title 18, United States Code, Sections 208(a), 216(a)(2) and 2.

**COUNT THREE**

**2005 CONFIDENTIAL FINANCIAL DISCLOSURE REPORT**

43.     Paragraphs 1 through 21 are re-alleged and incorporated herein.

44.     On or about August 7, 2005, **NEILSON** informed his accountant that, in 2004, he "bought" a one-third ownership interest in a building "partially occupied by the federal government," and that he had received $50,000 as a result of his ownership interest.

45.     An appraisal dated September 9, 2005 valued the Oxford FBI Building at $3,165,000. **NEILSON** and his partners used this appraisal to obtain permanent financing in the amount of $2,200,000 on November 1, 2005.

46.     As the Supervisory Senior Resident Agent in charge of the Oxford Resident Agency, **NEILSON** was required to truthfully complete an annual report of his assets and income, liabilities, and positions with organizations outside of his FBI employment. The Disclosure Report was then submitted for review to determine whether **NEILSON** had any conflicts of interest between his FBI responsibilities and his personal financial interests.

47.     On or about September 26, 2005, the Division Counsel's office for the FBI's Jackson Division sent a Confidential Financial Disclosure Report to **NEILSON** for completion, along with instructions for completing the Disclosure Report for the reporting period of October

10

1, 2004 through September 30, 2005. **NEILSON** was instructed that he was required to complete the Disclosure Report and submit it to the Jackson Division office approximately one week before the reporting deadline of November 1, 2005.

48.      **NEILSON** executed the annual Disclosure Report on October 17, 2005. **NEILSON** adopted his previous disclosure report from 2004, wherein he listed 12 assets, 2 credit card liabilities, and 3 positions outside of his FBI employment in which he was an "investor/owner." **NEILSON'S** Disclosure Report was timely received in Jackson prior to the deadline of November 1, 2005. **NEILSON** did not identify the Oxford FBI Building as an asset nor did he identify his $50,000 loan from C&G Partnership as a liability.

49.      The FBI relied upon **NEILSON'S** annual Disclosure Report as a safeguard to identify and address potential conflicts of interest between the public responsibilities of its employees and **NEILSON'S** private interests and activities.

50.      On or about October 17, 2005, in the Northern District of Mississippi, defendant herein, **PHILIP HALBERT NEILSON**, in a matter within the jurisdiction of the executive branch of the government of the United States (Department of Justice), knowingly and willfully, for the purpose of misleading the Department of Justice, made and used, and caused to be made and used, a false writing and document (that is, his 2005 Confidential Financial Disclosure Report), knowing the same to contain a material false and fraudulent statement and entry, in that **NEILSON** executed and submitted his 2005 Disclosure Report knowing that it contained a representation that it was true, complete, and correct, when, in truth and fact, as **NEILSON** then well knew, he omitted and concealed that, he—

11

a.       had a financial interest in the Oxford FBI Building, an asset with a fair market

value greater than $1,000 as of September 30, 2005; and

b.       had a loan of $50,000 from C&G Partnership, a liability greater than $10,000

during the 2005 reporting period.

The above is a violation of Title 18, United States Code, Section 1001(a)(3).

**COUNT FOUR**

**2006 CONFIDENTIAL FINANCIAL DISCLOSURE REPORT**

51.       Paragraphs 1 through 21 and 44 through 46 are re-alleged and incorporated

herein.

52.       On or about October 1 and October 7, 2005, **NEILSON** executed various

documents reflecting that he had a "financial interest" in the borrowing of $2,200,000 for the

refinancing of the Oxford FBI Building and that he was acting as a "member" and "loan

principal/guarantor" on behalf of the borrower, C&G Properties, LLC.

53.       On November 1, 2005, **NEILSON** signed a Loan Closing Statement

acknowledging that he, as one of the"Members/Managers" of C&G Properties, LLC, was

borrowing $2,200,000 for the refinancing of the Oxford FBI Building.

54.       In an undated handwritten note to his accountant regarding his 2005 tax return,

**NEILSON** stated, with regard to C&G Properties, LLC (the LLC which owned the Oxford FBI

Building), that he managed the property "on almost a daily basis" and that he was "very active"

in such management.

55.     In or about January, 2007, the attorney for the FBI's Jackson Division sent a

Confidential Financial Disclosure Report to **NEILSON** for completion, along with instructions

for completing the Disclosure Report for the reporting period of October 1, 2005 through

December 31, 2006.  **NEILSON** was instructed that he was required to complete the Disclosure

Report and submit it to the Jackson Division office approximately one week before February 15,

2007.

56.     **NEILSON** executed the annual Disclosure Report on February 5, 2007, wherein

he listed 5 assets, no liabilities, and no outside positions.  The Disclosure report was timely

received in Jackson sometime before the deadline of February 15, 2007.  **NEILSON** did not

identify his $50,000 loan from C&G Partnership as a liability or his outside position as a

representative of the business entity C&G Properties, LLC.

57.     The FBI relied upon **NEILSON'S** annual Financial Report as a safeguard to

identify and address potential conflicts of interest between the public responsibilities of its

employees and **NEILSON'S** private interests and activities.

58.     On or about February 5, 2007, in the Northern District of Mississippi, defendant

herein, **PHILIP HALBERT NEILSON**, in a matter within the jurisdiction of the executive

branch of the government of the United States (Department of Justice), knowingly and willfully,

for the purpose of misleading the Department of Justice, made and used, and caused to be made

and used, a false writing and document (that is, his 2006 Confidential Financial Disclosure

Report), knowing the same to contain a material false and fraudulent statement and entry, in that

**NEILSON** executed and submitted his 2006 Disclosure Report knowing that it contained a

13

representation that it was true, complete, and correct, when, in truth and fact, as **NEILSON** then well knew, he omitted and concealed that, he—

    a.      had a loan of $50,000 from C&G Partnership, a liability greater than $10,000 during the reporting period; and

    b.      had an outside position as a representative of the business entity C&G Properties, LLC, in that he was a member and manager of C&G Properties with management responsibilities, that is, among other things, managing the property, including advertising for, finding, and negotiating with prospective tenants for the benefit of C&G Properties, LLC; and performing all services that were necessary and proper for the operation and management of the property.

The above is a violation of Title 18, United States Code, Section 1001(a)(3).

## COUNT FIVE

59.      On or about December 4, 2001, **NEILSON** signed a memo regarding "Unauthorized Disclosure of Procurement Information." **NEILSON** signed as a representative of the FBI who was associated with the procurement of a new location to house the FBI in Oxford, Mississippi.

60.      On or about December 4, 2001, **NEILSON**, along with other government representatives, viewed various locations for the purpose of determining which locations should be solicited for bids on a new Oxford FBI Building.

61.      Following the viewing of these properties, **NEILSON**, along with other government representatives, participated in a meeting to discuss the various locations viewed

and whether bids should be solicited for those properties. In that meeting, **NEILSON**, as a representative of the FBI, signed six (6) different "Broker Lease Market Survey" documents. In signing each Broker Lease Market Survey, **NEILSON** indicated whether he agreed with the decision to solicit bids regarding each particular location for the new Oxford FBI Building.

62.     After considering the potential locations viewed during the site selection process in December of 2001, a satisfactory location was not identified. A decision was made to consider additional properties in an expanded geographic area.

63.     On or about June 4, 2002, **NEILSON** signed another memo regarding "Unauthorized Disclosure of Procurement Information." **NEILSON** once again signed as a representative of the FBI who was associated with the procurement of a new location to house the FBI in Oxford, Mississippi.

64.     On or about June 4, 2002, **NEILSON**, along with other government representatives, viewed various locations for the purpose of determining which locations should be solicited for bids on a new Oxford FBI Building.

65.     Following the viewing of these properties, **NEILSON**, along with other government representatives, participated in a meeting to discuss the various locations viewed and whether bids should be solicited for those properties. In that meeting, **NEILSON**, as a representative of the FBI, signed six (6) different "Broker Lease Market Survey" documents. In signing each Broker Lease Market Survey, **NEILSON** indicated whether he agreed with the decision to solicit bids regarding each particular location for the new Oxford FBI Building.

66.     On or about October 9, 2008, in the Northern District of Mississippi, defendant

herein, **PHILIP HALBERT NEILSON**, in a matter within the jurisdiction of the executive

branch of the government of the United States (the Department of Justice), knowingly and

willfully, for the purpose of misleading the Department of Justice, made, and caused to be made,

materially false and fraudulent statements and representations to an agent of the Department of

Justice-Office of Inspector General, in that, when asked about the site selection process used to

evaluate various locations for the FBI Building, **NEILSON** stated that he did not participate in

any meetings to discuss potential locations for the FBI Building, when, in truth and fact, as

**NEILSON** then well knew, he actively participated in meetings with personnel from the GSA

and the FBI, on or about December 4, 2001 and June 4, 2002 regarding the suitability of various

locations.

The above is a violation of Title 18, United States Code, Section 1001(a)(2).

UNITED STATES OF AMERICA, by

**A TRUE BILL**

_____
DAVID R. DUGAS
United States Attorney
Middle District of Louisiana

|s|
_____
GRAND JURY FOREPERSON

_____
RENÉ SALOMON
Special Attorney to the
United States Attorney General

1-13-10
_____
DATE

_____
RICHARD L. BOURGEOIS, JR.
Special Attorney to the
United States Attorney General

16